### Case No. 4,466.
The EMMA L. COYNE.

[11 Chi. Leg. News, 98.]

District Court, E. D. Michigan. 1878.

H. W. Montrose, for libellant.
F. H. Canfield, for claimant.

BROWN, District Judge. Conceding the master had authority to assign to Hatt the account in question, there was no such absolute assignment as to pass the title to the assignee. It is clear he did not receive it in payment of his claim, as the master did not charge him with the amount upon the books of the boat, and Jones, in his schedule, set forth Hatt's wages as a valid debt against his estate. It is scarcely probable, too, that Hatt, having a valid lien upon the tug for his wages, would have taken in payment therefor the assignment of a claim against a vessel, which, at that time, and for several months thereafter, was out of the jurisdiction of this court. His conduct also confirms this view. He did not sue the account until he had obtained Jones' consent to do so, and finding his suit likely to prove ineffectual, he returned the bill to Jones or the master, filed his libel against the tug, and collected his claim. No notice was given of the assignment to Coyne, the owner, who might at any time have discharged the debt by payment to Jones. I regard the transfer, at most, as an equitable assignment to Hatt, who held the claim as collateral security for his wages. When he had collected his own bill from the Brady he lost all claim whatever to this account, the property in which, if it ever passed to him, at once reverted to the owner. In this aspect, the question of redelivery is immaterial. It is true that Jones did not include this claim among his assets, and afterwards stated to Pridgeon, the mortgagee, that he had no interest in any claim against the Coyne, but in view of the admitted facts in the case, I think this was clearly a misapprehension on the part of Jones. The case is not dissimilar to that of The Napoleon [Case No. 10.011], in which the libellants took a note for towage, and after indorsing it, transferred it to a bank. It was not paid at maturity, and they paid and took it up. It was held that the transaction by which the note was discounted and again taken up, was not such a transfer of the original claim as to amount to an assignment and an extinguishment of the lien.

I see no objection to filing the libel in the name of Jones, who was the owner of the tug, and held the legal title to the bill. The fact that the libel was filed in the interest of another, is of no consequence. In such case the suit may be prosecuted in the name of the assignor or of the assignee. It is an every day practice in admiralty to file libels in the name of the holder of the legal title in realty for the benefit of others more or less interested in the claim. The Wasp, L. R. I. Adm. & Ecc. 367; Fretz v. Bull, 12 How. [53 U. S.] 466; The Monticello, 17 How. [58 U. S.] 152. Indeed, there has scarcely been an important collision case commenced in this court for years, in which the underwriters of the injured vessel had not an interest. I regret that I am unable to concur in the opinion of my learned predecessor in the case of The Champion [Case No. 2,583], that a lien for supplies or towage is not assignable. The question has been so exhaustively discussed in a recent opinion by Judge Lowell, in The Sarah J. Weed [Id. 12,350], that I deem it quite sufficient to announce my concurrence in his views, without an examination of authorities. In no case in which the opposite rule is maintained, except that of Patchin v. The A. D. Patchin [Id. 10,794], is the question discussed upon principle. Judge Conkling, in that opinion, assumes an analogy between a maritime lien and a common law lien, which I think does not exist. It is because a common law lien is dependent upon possession, that when possession is lost by an assignment or transfer of the thing, the lien falls with it. By parity of reasoning, inasmuch as a maritime lien is not dependent upon possession, an assignment or transfer of the debt should not destroy the lien. Because in one case the transfer of the res or pledge destroys the lien, it by no means follows that in the other the assignment of the debt should have the same effect. The reasoning seems to me not only illogical, but the result one that must often be productive of injustice. That a creditor who desires to realize his money immediately, should be obliged to sacrifice the security for his debt, which gives it its principal and possibly its only value, by an act which can result in no injustice to its debtor, seems to me a hardship which ought not to be imposed

without the strongest reason for its necessity. The rule contended for would operate with peculiar harshness upon sailors, who are proverbially the neediest and most improvident of men, and those to whom an immediate payment is most necessary. It is true, as Judge Conkling observes, that the ability to purchase seamen's liens may occasionally be made use of to annoy the owners, but the same power to enforce the lien would still exist if the claim had never been assigned. I apprehend cases of this kind are much rarer than those where sailors themselves combine together to attach a vessel and make costs, out of some spite and ill-will to the master. It seems to me a matter of practical indifference to the owner whether the lien be enforced by the original holder or his assignee.

The case of The Champion [supra] was decided by Judge Longyear, rather upon authority than reason, and it is to be regretted that the learned judge did not bring to bear upon the question, his usual thoughtful and independent consideration. Indeed he remarks that he had not the time to devote to a discussion of the soundness of the decisions upon which he relied. The opinion in this case was followed without argument in The Napoleon, above cited, though the case was distinguished from The Champion, and the point was not necessary to its determination. A like ruling was made by the learned judge for the southern district of Ohio, in the recent case of The R. W. Skillinger [Case No. 12,181], in which the opinion of Judge Leavitt, in Logan v. The Aeolian [Id. 8,465], and Rusk v. The Freestone [Id. 12,143], was adopted without comment, as the settled law of the court. But see, contra, The Norfolk and Union [Id. 10,-297]. It must be confessed that so far as the question depends upon authority, there is large liberty of choice; but upon principle I see no reason why a maritime lien may not be assigned as well as a mortgage, a judgment debt, a mechanic's lien, or that of a vendor of real estate. It seems to be now settled, by a large preponderance of authority, that liens of these descriptions are assignable: Phil. Mech. Liens, c. 6; 2 Washb. Real Prop. 91, 92. The second depends upon the question whether due diligence was used in the enforcement of the claim. Pridgeon, the claimant, held a second mortgage, dated December 16th, 1874, as a continuing security for any indebtedness then due from Coyne, and for any future indebtedness which might become due by way of liens or indorsements. The services were rendered in October, 1875, the advances in respect of which Pridgeon claims to be a bona fide purchaser, were made after this time and before February, 1876. He is a bona fide purchaser, if at all, from the time these advances were made. Ladue v. Detroit & M. R. Co., 13 Mich. 380. In February, 1876, he foreclosed this mortgage, and bought in the property. In August he bought up a prior mortgage of $4,000, held by Ralph & Burt, for one-half its nominal value. The libel was filed February 16th, 1876, but no attachment seems to have been issued until October 26th of the same year, when a writ was issued upon other libels. While I think the issuing of an attachment, placing it in the hands of the marshal of the district where the vessel is owned, and keeping it alive by successive renewals, would be sufficient diligence under the circumstances, simply filing a libel was notice to no one, and answered no requirement of the law. Wade, Notice, § 348; Games v. Stiles, 14 Pet. [39 U. S.] 322. But it appeared that during the winter of 1875–6 the vessel was laid up in Chicago. During the season of 1876, she ran between Sarnia and Chicago, making monthly trips, stopping at Port Huron, in this district, only long enough upon each trip to get her clearance at the custom house. As an attachment was issued in October, 1876, and kept alive by renewals, no laches are attributable to the libellant after that time. Prior to that date it does not seem to me there was that reasonable opportunity for the enforcement of the claim which is required to put the libellant in default. The inability of the marshal to find the vessel for ten months after the writ was issued (the vessel was in fact never actually seized), would seem to indicate that it would have been useless to issue it sooner. As the vessel was owned in this district, and libellant was also a resident of Detroit, I think he was under no obligation to have her arrested in Chicago, to which port she made her regular trips. Beside, I am satisfied that Pridgeon had notice of this claim shortly after he purchased the vessel upon foreclosure, and before he bought the Burt & Ralph mortgage. Mr. Montrose, libellant's proctor, swears positively that he gave him notice of this claim, in the spring of 1876. Pridgeon swears simply that he does not recollect, but admits that several persons spoke to him about their claims at or near this time. At any rate, if Pridgeon was not informed of this specific debt, I have no doubt he was sufficiently apprised of the amount of claims against the vessel, to put him upon inquiry, and that the advances were made without reference to the amount of claims against her.

There must be a decree for the libellant.